UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:                                                          CASE NO.

**RONDON R. BOZEMAN**                          **05-10095**
**DONNA G. BOZEMAN**                            CHAPTER 7

DEBTORS

**BTR AIR CHARTER & MANAGEMENT, INC.**        ADV. NO.

PLAINTIFF                                            **05-1080**

V.

**DONNA G. BOZEMAN, RONDON R. BOZEMAN**
**AND DR. ERIC GEORGE**

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### Introduction

        This lawsuit comes to the bankruptcy court on the pretext of a nondischargeability

claim against debtors Rondon and Donna Bozeman, though it actually is a dispute

between two non-debtors, BTR Air Charter & Management, Inc. ("BTR") and Eric

George, M.D.  The debtors' liabilities are almost incidental to this litigation, since a

Louisiana state court already has sentenced Donna Bozeman to make restitution to BTR

for her theft and computer fraud.  That obligation is nondischargeable.[1]

---

[1]  Bankruptcy Code section 523(a)(7) excepts from discharge a debt for a "fine, penalty or forfeiture
payable to and for the benefit of a governmental unit . . . ."  The United States Supreme Court has
concluded that restitution orders in criminal proceedings are nondischargeable under section 523(a)(7).
*Kelly v. Robinson*, 479 U.S. 36, 53, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) ("The sentence following a
criminal conviction necessarily considers the penal and rehabilitative interests of the State.")

Plaintiff BTR did not establish its right to recover from Dr. George, and its claims against him should be dismissed. As a result, Dr. George's cross-claim against Donna Bozeman falls.

### Procedural History

This proceeding began with BTR's suit on open account against Dr. Eric George in the Nineteenth Judicial District Court for East Baton Rouge Parish, Louisiana.[2] Though BTR's original petition did not name the Bozemans defendants, its amended petition made fraud and conversion claims against the debtors, and also claimed Dr. George conspired in the fraud.[3]

After Rondon and Donna Bozeman filed chapter 7 in late 2005, Dr. George removed BTR's petition to federal district court. The district court accepted a magistrate judge's recommendation that the removed lawsuit was within the court's bankruptcy jurisdiction under 28 U.S.C. §1334(b), and referred the lawsuit to this court. Dr. George then answered BTR's state court lawsuit, and cross-claimed against debtor Donna Bozeman for a nondischargeable contribution judgment should the court render judgment in BTR's favor and against George.

Despite the reference of the case to this court, the parties do not agree that the entirety of the litigation is a core proceeding within the meaning of 11 U.S.C. §157(b), which would allow the court to enter a final judgment. Although the dischargeability determinations involving the debtors are core proceedings, the claims of BTR against Dr.

---

[2] Petition on Open Account filed August 20, 2004 (Exhibit 1 to Attachment 2 to P-2).

[3] First Supplemental and Amending Petition for Fraudulent Conversion, Damages and Open Account, filed October 29, 2004 (Exhibit 10 to Attachment 2 to P-2).

George are non-core.[4]  Therefore, absent the parties' consent, this court submits these proposed findings of fact and conclusions of law to the United States District Court for review.  28 U.S.C. §157(c)(1).[5]

**Facts**

I.    <u>BTR's Business and Bozeman's Responsibilities</u>

BTR arranges charters of private aircraft for its customers, using its own airplanes and aircraft belonging to others.  Donna Bozeman went to work for BTR in 1999 as a part-time bookkeeper.  When Cynthia Polson resigned as BTR's bookkeeper in December 2001, Bozeman filled her position, and also began coordinating all the company's charter flights.  Elizabeth Chesson Martin, daughter of BTR owner Don Chesson, served as the company's back-up bookkeeper and dispatcher while Bozeman worked there.  Ms. Martin confirmed that during all times relevant to the events that are material to the outcome of this controversy, Donna Bozeman was BTR's primary flight coordinator and scheduler, as well as its bookkeeper.  Martin testified that BTR was a small, family-owned business, and that at least until discovery of the losses that led to this lawsuit, Bozeman was treated as a part of the owner's family.

Before Donna Bozeman started working for BTR, she worked for G.H. Enterprises, a business in quarters adjoining BTR's offices.  Mrs. Bozeman lost her position with G.H. Enterprises after misusing that company's funds to pay her daughter's tuition.  Though no party offered evidence concerning the way Bozeman obtained the

---

[4]  "If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding . . . ."  *Matter of Wood*, 825 F.2d 90, 97 (5th Cir. 1987).  BTR's claims against Dr. George on the open account and for conspiring in Donna Bozeman's fraud are state law claims that could have, and indeed were, brought in state court irrespective of the debtors' bankruptcy.

[5]  After this court enters its proposed findings of fact and conclusions of law, the clerk shall transmit them to the district court.  28 U.S.C. §157(c)(1) and Fed. R. Bankr. P. 9033(a).

money,[6] the evidence established that for some reason Don Chesson reimbursed G.H. Enterprises for the funds she diverted. Despite Chesson's knowledge of Bozeman's misappropriation from her prior employer, he allowed her to handle all BTR's bookkeeping after Polson left BTR.

      II.    <u>Bozeman's Dealings with Dr. George</u>

Dr. George is a Metairie, Louisiana hand surgeon who practices through Hand Surgical Associates, Ltd. ("HSA"). Beginning in July or August 2001, George regularly chartered flights to Hilton Head, South Carolina. The doctor first used a New Orleans company to arrange the charter flights. Later a friend referred him to Donna Bozeman at BTR.

Dr. George first contacted Bozeman to arrange a June 2002 private charter flight to Asheville, North Carolina for his daughter and her friends. After the Asheville trip, Dr. George began to charter flights through BTR more often. Mrs. Bozeman essentially arranged all the charters, including, when necessary, local transportation and accommodations for George and his traveling companions. Dr. George testified that he dealt exclusively with Bozeman whenever he chartered flights through BTR. In fact, he never dealt with anyone else at the company until May 2004.

Dr. George paid for some of the BTR charters using his American Express card. However, at some point Mrs. Bozeman told him that BTR could charge George less if he paid by check instead of using his American Express card, because American Express charged BTR an additional fee for each transaction. Thereafter, Dr. George's (or HSA's) checks for the charters were made payable either to BTR or, more often, to Donna

---

[6] The debtor sat through both days of trial without testifying on her own behalf. In fact, no party even called Donna Bozeman to testify at trial.

Bozeman.  Dr. George insisted that he made the checks payable as Donna Bozeman directed him: she told him how much to pay and to whose order the checks should be made.

III.    Discovery of Bozeman's Misappropriations

By January or February 2004, Chesson noticed that BTR's income was declining, despite its active charter business.  At Chesson's request, Cynthia Polson, BTR's former bookkeeper, reviewed company records and quickly found evidence of irregularities, including BTR's payments on Bozeman's personal American Express account and checks drawn on BTR's bank account both signed by and payable to Bozeman.  Moreover, Polson could not locate invoices for many charter flights Dr. George booked through BTR.  The investigation eventually revealed that Bozeman had begun misappropriating funds from BTR in February 2001, months *before* she replaced Ms. Polson as company bookkeeper and *before* Dr. George chartered his first flight through the company.[7]

When Donna Bozeman was unable to explain the discrepancies to Chesson and Polson, BTR terminated her in May 2004.  Bozeman and her counsel failed to negotiate a settlement of BTR's claims, and the company reported the diversions to law enforcement authorities, who arrested Donna Bozeman in June 2004.  Bozeman's guilty plea drew a sentence that included restitution totaling $167,000.[8]

---

[7]  Defendant's Exhibit 54 is a summary of Donna Bozeman's misappropriations prepared by Cynthia Polson.  The summary indicates that the first check Bozeman wrote to herself from the BTR account was dated February 16, 2001.  Polson testified that Donna Bozeman misappropriated $54,662.92 from BTR that was not associated with Dr. George's charters.

[8]  The Nineteenth Judicial District Court on October 7, 2005 ordered Donna Bozeman to make restitution to BTR of $167,000 as part of its sentence imposed in response to her guilty plea to charges of felony theft, access device fraud and computer fraud.  True Extract of Criminal Court Minutes, Plaintiff's Exhibit 4.

Elizabeth Martin intimated in her direct examination that Donna Bozeman's family materially benefited from her theft from BTR. She stated that during the time Donna Bozeman worked for the company, the Bozeman family bought a new house, new cars, four-wheelers, and a trailer, and vacationed in San Antonio, Las Vegas and Walt Disney World and traveled to NASCAR events. On cross-examination by Rondon Bozeman's attorney, she admitted to knowing only that Rondon participated in the family spending. Martin had no proof that Mr. Bozeman knew anything about the source of the funds used for the purchases.

Rondon Bozeman testified that at least one of the vehicles purchased while Donna worked at BTR was financed, that he won the trips to the NASCAR events and that his mother-in-law paid for most of their one trip to Disney World. He stated that he rarely wrote checks from the couple's joint checking accounts and that he did not keep the family financial records. No party offered independent evidence to contradict Rondon Bozeman's version of these facts.

Dr. George and Don Chesson agree that Chesson's May 2004 call to Dr. George to discuss the problems arising from Bozeman's misappropriations was the first meaningful contact Dr. George had with anyone from BTR other than Bozeman.[9] Chesson explained to Dr. George in their initial telephone conversation that BTR needed his help recreating some of its records for his charter flights. In the ensuing weeks,

---

[9] Dr. George testified that he first learned Chesson owned BTR during the initial May 2004 telephone conversation. However, Frank Noel, a pilot, testified that while flying Dr. George to South Carolina in July 2003, he told Dr. George that Don Chesson owned BTR, though he could not recall whether he'd told Dr. George anything about Donna Bozeman's position at BTR. Dr. George recalled talking with Noel on a flight, but denied that they discussed Chesson. The evidence regarding the timing of Dr. George's realization that Chesson owned BTR is, therefore, inconclusive. Nevertheless, it is undisputed that the first time Dr. George actually had significant communication with anyone from BTR other than Donna Bozeman was May 2004.

Chesson called Dr. George several times to determine whether George had taken and paid for specific flights.  Dr. George explained that he had paid for these trips as Bozeman had instructed him, but nevertheless stopped payment on some of his checks and sent BTR copies of those checks and others to prove he had paid for the trips.  Eventually Dr. George sent BTR over $80,000 to pay invoices for charter flights that previously had not been invoiced.

Dr. George insisted at trial he did not know Bozeman was misappropriating any of his payments, and Chesson admitted on cross-examination that he had no personal knowledge that Dr. George knew about any of Bozeman's thefts from BTR until Chesson told George about them in May 2004.

IV.     BTR's Failure to Discover Bozeman's Scheme

Chesson's difficulty in determining which BTR invoices had been paid is not surprising, in light of the evidence that the company had almost no internal financial controls.  Ms. Polson, BTR's former company bookkeeper, testified that the company did not routinely reconcile its bank statements.  In fact, Elizabeth Martin – Chesson's daughter – stated that after she received and opened the company's monthly bank statements, she gave them to Bozeman.

Rick Noble, Dr. George's accounting expert, testified that BTR should have discovered Bozeman's misappropriations in March 2001.  His testimony also established that even a casual review of the statements for BTR's two bank accounts would have revealed improper transactions on the account, including electronic payments on American Express cards,[10] when BTR did not have an American Express account.

---

[10]  The evidence established that Donna Bozeman made payments on her own American Express account from BTR's Bank One account.

Noble further opined that had BTR simply reconciled the cleared checks listed on

its monthly bank statements against its QuickBooks accounting software check register,

the plaintiff immediately would have determined that checks supposedly voided had in

fact been drawn on the company's bank account.  That discovery would have led to the

discovery of Bozeman's thefts.

V.      Dr. George's Debt to BTR

Cynthia Polson testified that the unpaid invoices relating to Dr. George's charter

flights, including flights BTR arranged though other air charter companies, totaled

$135,402.61.  BTR normally would have been paid $153,727.51 on those invoices, had it

received its normal profit on the transactions.

Using Ms. Polson's recap of the invoices from BTR and the payments from Dr.

George and documentation supporting that recap, Noble was able to calculate Dr.

George's payments and compare them to BTR's invoices for his flights.  Noble concluded

that unpaid invoices for Dr. George's travel totaled $253,849.56, and payments to BTR

and Bozeman on George's behalf totaled $253,848.32.  The difference between the two

totals is $1.24.

**Analysis**

I.      Dr. George is Not Liable to BTR for Donna Bozeman's Fraud.

BTR contends that Dr. George knew of and participated in Donna Bozeman's

scheme to misappropriate its funds.  Dr. George maintains that he made payments as

Bozeman directed him, and believed that she was acting for BTR in all of George's

dealings with her.  This case turns on Bozeman's status as an agent of BTR, and

specifically whether BTR, or Dr. George, should bear the consequences of her faithlessness.

Under Louisiana law, an agency relationship (sometimes referred to by the civilian term *mandate*, with the agent denominated the *mandatary*) may be express, or it may be implied from the apparent authority of the supposed agent. La. Civ. Code arts. 2985, 2986 and 3021.[11] An express agency or mandate is one in which the agent is authorized to act for the principal by operation of law, or by contract, or by a juridical act. La. Civ. Code art. 2986.

Civil Code article 3021 states that "one who causes a third person to believe that another person is his mandatary is bound to the third person who in good faith contracts with the putative mandatary." "Apparent agency arises when the principal has acted so as to give an innocent third party a reasonable belief that the agent had the authority to act for the principal." *Venable v. United States Fire Insurance Company*, 829 So.2d 1179, 1182 (La. App. 3[d] Cir. 2002).

Thus, apparent agency arises from the parties' words and conduct and the circumstances of the case. *Id*. at 1183 (citations omitted). Moreover, an agency relationship "may be created even though there is no intent to do so." *Id*. (citations omitted). For example, even if an agent of a corporation lacks the actual authority to contract for the corporation, the inaction of the corporation with respect to the alleged agent's conduct can create the impression that the agent had authority to act for the corporation. *Manuel Truck & Equipment Co., Inc v.B. G. Hooker Petroleum Transport, Inc..*, 430 So.2d 1367 (La. App. 3[d] Cir. 1983) (evidence that defendant's president had

---

[11] The 1998 revision to Civil Code article 2985 uses yet another term for agency: *representation*. Article 2985 provides that one person "may represent another person in legal relations as provided by law or by juridical act."

previously handled company's day to day business transactions without interference from board of directors proved his apparent authority to enter into contract at issue). *See also Southern States Equipment Co., Inc. v. Jack Legett Co., Inc.*, 379 So.2d 881 (La. App. 4th Cir. 1980) (construction company that honored without question invoices based on receipts signed by construction foreman conferred apparent authority on foreman to sign receipts, and thus was bound by the terms in the receipts). A company also may vest a putative agent with apparent authority when it holds out the agent as the "go to" person for transactions with the company. *Venable*, 829 So.2d at 1183-4 (insurance agent who sold unique kind of insurance that company promoted solely through him, and who client believed was the only agent from whom the unique coverage could be obtained, was clothed with apparent authority to bind the insurance company).

In light of these authorities, the evidence compels the conclusion that BTR alone, and not Dr. George, must bear responsibility for BTR's losses at Donna Bozeman's hands. The evidence established that Dr. George dealt with BTR exclusively through Donna Bozeman before May 2004. BTR was a small company – at all relevant times it had only three or four employees. Bozeman's claim to George that she took care of "everything" at the company was corroborated by Elizabeth Martin's testimony that Bozeman indeed handled all flight coordination and scheduling. Don Chesson also admitted that Bozeman handled all of BTR's bookkeeping after Cynthia Polson left the company in late 2001. Dr. George essentially had no contact with anyone other than Bozeman in his business dealings with BTR before Bozeman's diversions came to light in May 2004.

BTR thus held out Mrs. Bozeman as manager of its charter business, even though she may not have held that title. George dealt only with Bozeman for a substantial dollar amount of charter business with BTR over an extended period.

Further, no evidence established that Dr. George should have known that Mrs. Bozeman lacked the authority to deal with George as she did, much less that she was diverting payments he made to BTR or other company funds. Nor did BTR offer any credible evidence that Dr. George conspired[12] with Donna Bozeman to make trips at no cost, or that he converted any of BTR's property.

Donna Bozeman's affidavits[13] are not credible. Although the affidavits were admitted, the court gives them no weight. Bozeman is a convicted felon, and was not subjected to cross examination. In light of her plea agreement, as well as the fact that payments by Dr. George could reduce her restitution obligation, Donna Bozeman's testimony – written or otherwise – is by its nature suspect and not worthy of any weight.

II.     <u>BTR's Lack of Internal Controls Gave Bozeman an Opportunity to Embezzle Before Dr. George did Business with BTR</u>.

BTR did not discover Bozeman's thefts and fraud until 2004, after Don Chesson became concerned about the company's decline in income. Nonetheless, BTR's loss was made possible only by the plaintiff's total lack of prudent internal controls.

The evidence established that even a casual review of BTR's bank statements would have revealed Bozeman's unauthorized transactions. Indeed, Bozeman first wrote herself a check on BTR's bank account in February 2001. A review of the February bank

---

[12]   BTR repeatedly alleged in its pleadings and memoranda that Dr. George had a "personal relationship" with Donna Bozeman, while never making plain the meaning BTR assigns to the term. In any case, BTR did not prove the existence of any relationship between Dr. George and Mrs. Bozeman other than a business relationship.

[13]   Defendant's Exhibits 44 and 48.

statement would have revealed that unauthorized transaction as early as March 2001, and given BTR an opportunity to stop Bozeman's diversions in their infancy.  It takes no special expertise to conclude that BTR's failure to monitor its accounts properly was extraordinarily neglectful.

The facts here are similar to those in *Whittington Co. v. Louisiana Paper Co.*, 69 So2d 372 (La. 1953).  There, a lessee made its monthly rent checks payable to the lessor's accountant, instead of depositing them in the lessor's bank account as the lease required.  The accountant deposited some of the checks, but cashed most and converted the proceeds.  The Louisiana Supreme Court refused to hold the lessee liable for the lessor's loss:

> [A]lthough the defendant was perhaps negligent or remiss in not making the rental payments in the manner prescribed in the leases, it was the carelessness, negligence, and laxity of the plaintiff which enabled [the accountant] to continue his misappropriations for so long a period without detection, and the equitable doctrine that, as between two innocent persons, the one who most contributed to the loss should bear the consequences is applicable to this case.  *Young v. Gretna Trust & Savings Bank*, 184 La. 872, 168 So. 85 [La. 1936].  To us there can be no question that the carelessness, negligence, and laxity of the plaintiff contributed in so great a degree to its loss that it now has no right to be reimbursed by the defendant for its loss.

*Id*. at 374.

The Fifth Circuit also has recognized that a principal who allows an agent to commit fraud when acting with apparent authority is not without fault himself.  In *Home Life Ins. Co. v. Equitable Equipment Co., Inc.*, 680 F.2d 1056, 1059-60 (5th Cir. 1982), *judgment corrected by* 694 F.2d 402 (5th Cir. 1982), the court noted that several Louisiana courts have cited with approval the Restatement (First) of Agency, which provides:  "A principal who puts a servant or other agent in a position which enables the

agent, while apparently acting within his authority, to commit a fraud upon third persons

is subject to liability to such third persons for the fraud." Restatement (First) of Agency §

261 (1933) (current through September 2006). The Louisiana cases cited in *Home Life*

are: *LeBrane v. Lewis*, 292 So.2d 216 (La. 1974); *Blanchard v. Ogima*, 215 So.2d 902

(La. 1968); *Lou-Con, Inc. v. Gulf Bldg. Servs., Inc*., 287 So.2d 192 (La. App. 4th Cir.

1973); and *Yoars v. New Orleans Linen Supply Co.*, 185 So. 525 (La. App. Orleans

1939). The *Yoars* court stated that "[t]he test in determining the responsibility of a

principal in this type of case is whether the agent was cloaked with the apparent authority

to perform the acts which resulted in the loss and not whether he was actually vested with

such authority." *Yoars*, 185 So. at 528.

BTR was best positioned to stop Bozeman's diversions, and no doubt in hind sight

should have used more caution, especially since its owner knew of Bozeman's

misappropriation from her prior employer. Her theft from BTR began well before Dr.

George's first charter in the summer or fall of 2001. The evidence does not support

BTR's effort to hold Dr. George culpable for its losses.

III.   Dr. George Owes BTR Only $1.24 for Charter Flights.

The evidence established that Dr. George actually paid BTR all but a *de minimis*

amount he owed the plaintiff.

BTR's witnesses testified that the plaintiff was owed $135,402.61 (without adding

its profit) for flights it arranged for Dr. George. However, Dr. George paid for many of

the flights he chartered through BTR even before Don Chesson contacted him in May

2004. BTR does not dispute that Dr. George paid for many more charters once BTR

contacted him in May 2004 and issued missing invoices. Specifically, Mr. Noble

testified that Dr. George actually paid a total of $253,848.32 for flights arranged through BTR. That sum is $1.24 less than the total of BTR's invoices for Dr. George's charters.

IV     <u>The Criminal Restitution Obligation is a Community Debt, but Rondon Bozeman May Discharge It</u>.

Donna Bozeman's husband, debtor Rondon Bozeman, received scant attention at trial. The parties offered almost no evidence bearing on his culpability for the thefts, emphasizing instead the marital community's alleged benefit from Donna Bozeman's theft.

Louisiana Civil Code article 2361 provides that "[e]xcept as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations." Pursuant to La. Civ. Code art. 2363, an obligation incurred during the community regime, but not for the common interest of the spouses, or an obligation resulting from an intentional wrong "not perpetrated for the benefit of the community," is a separate obligation. To overcome the presumption that a debt arising during the existence of a marital community is a community obligation, clear and convincing evidence must prove that the debt in question was *not* incurred for the community's benefit. *Simoneaux v. Brown*, 403 F.Supp. 526, 530 (M.D. La. 2005), citing *Keene v. Reggie*, 701 So.2d 720, 729 (La. 1997).

No party offered clear and convincing evidence that Donna Bozeman's misappropriations were incurred solely for her benefit and not for the benefit of the marital community. Thus, the criminal restitution obligation the Nineteenth Judicial District Court imposed on Donna Bozeman remains presumptively a community obligation for which Rondon Bozeman is liable.

However, the state court did not impose a restitution obligation upon Rondon Bozeman and the classification of the debt as community does not automatically make it nondischargeable.  The next issue then is whether Rondon Bozeman may discharge this community debt.  The debt is only nondischargeable as to him under 11 U.S.C. §523(a)(2)(A) if the underlying fraud can be imputed to him.

The Fifth Circuit has imputed the fraud of one partner to another "innocent" partner, and even from a spouse involved in a fraudulent business scheme to the other "innocent" spouse, in the context of dischargeability litigation under 11 U.S.C. §523(a)(2).  *In re M. M. Winkler & Assoc.*, 239 F.3d 746 (5th Cir. 2001); *In re Luce*, 960 F.2d 1277 (5th Cir. 1992).  However, the Fifth Circuit also has not extended its reasoning and imputed nondischargeability to spouses who are not jointly involved in a business venture, absent evidence linking the "innocent" spouse to the fraud of the culpable spouse.  *In re Allison*, 960 F.2d 481, 486 (5th Cir. 1992).

BTR did not conclusively prove that Rondon Bozeman participated in, or even knew of, his wife's fraudulent diversion of BTR's funds.  Accordingly, even assuming that Fifth Circuit jurisprudence would allow this court to impute the nondischargeability of Donna Bozeman's obligation to Rondon Bozeman, no evidence supports doing so.  Therefore, Rondon Bozeman's alleged liability to BTR for Donna Bozeman's diversions in dischargeable.

## Conclusion

BTR did not prove that Dr. Eric George conspired with Donna Bozeman or converted BTR's assets.